**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
THOMAS HALL,                                    :          20-CV-2638
                                                :
                        Plaintiff,              :
                                                :          **COMPLAINT**
            -against-                           :
                                                :
HOFSTRA UNIVERSITY,                             :          **JURY TRIAL**
                                                :          **DEMANDED**
                        Defendant.              :
-------------------------------------------------------------------X


I.      **The Nature of This Action**

1.      While both were students at Defendant Hofstra University, Plaintiff Thomas Hall and
        fellow student Elisabeth A. Reid dated each other.

2.      At an off-campus social event in 2016, Mr. Hall and Ms. Reid had a heated, agitated
        argument, after which Ms. Reid filed a complaint alleging that Mr. Hall had acted
        aggressively toward her, pushed her, cornered her and threw pepper in her eyes, in violation
        of Hofstra's policy against "dating violence."

3.      During an investigation period lasting nearly a year—during which Mr. Hall was prohibited
        from entering *any* of Hofstra's residence Halls—and at the subsequent hearing, it was
        conclusively revealed that, not only had Mr. Hall not touched Ms. Reid in an aggressive
        manner, but that Ms. Reid had in fact been the aggressor.

4.      The argument began when Ms. Reid slapped Mr. Hall in the face *while he was asleep*.  She
        then threw pepper on him and slapped his groin area with the back of her hand.  This was
        all established *by Ms. Reid's own admissions*.

1

5.      Incredibly, based on these undisputed facts, Hofstra found Mr. Hall responsible for "dating violence" and suspended him, while imposing no punishment or discipline of any kind on Ms. Reid (although Ms. Reid had been directed to not contact Mr. Hall—a directive she violated without any repercussions).

6.      Mr. Hall appealed Hofstra's determination twice, pursuant to Hofstra policies.  Hofstra upheld and affirmed its original determination on both appeals, adding that "we do hope that this will be a valuable learning experience for you . . ."

7.      Mr. Hall filed an action pursuant to CPLR Article 78 with the Supreme Court of New York, County of Nassau.  The Article 78 Court found Hofstra's determination to be arbitrary and capricious, annulled the determination and ordered Hofstra to expunge the sanctions from Mr. Hall's record.

8.      Mr. Hall's education and academic performance and emotional well-being have been negatively impacted as a result of Hofstra's actions, for which Mr. Hall seeks damages as set forth below.

## II.      <u>The Parties</u>

9.      Plaintiff Mr. Hall  ("Mr. Hall" or "Plaintiff") is a natural person currently residing in the State of New York.  During the events described herein, Mr. Hall was a student at Defendant Hofstra University in Hempstead, New York.

10.     Upon information and belief, Defendant Hofstra University ("Hofstra" or "Defendant") is a non-profit corporation organized under the laws of the State of New York operating as a private university.  Hofstra's campus is located in Hempstead, New York.

III.    **Jurisdiction and Venue**

11.    This Court has diversity, federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because the claims herein arise under federal law; and the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

12.    This Court has personal jurisdiction over Defendant Hofstra on the grounds that Defendant Hofstra is conducting business within this District.

13.    Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

IV.    **Factual Allegations**

14.    In January of 2014, Mr. Hall enrolled as a student at Hofstra.

15.    Plaintiff received and relied upon Hofstra's codes and policies regarding student conduct, disciplinary actions, and dating violence.

16.    Beginning in late 2015 Mr. Hall began dating Ms. Reid.

*The Underlying Incident*

17.    On or around the night of April 28, 2016, Mr. Hall accompanied Ms. Reid to an off-campus sorority formal event sponsored by Ms. Reid's sorority on a boat sailing out of Freeport, New York.

18.    That night, Mr. Hall and Ms. Reid had a verbal argument on board the vessel and Mr. Hall separated himself from Ms. Reid at a different location on the vessel.

3

19.   The very next day, on April 29, 2016, Ms. Reid submitted a hand-written complaint to Hofstra's Office of Public Safety alleging that, on the boat the previous night, Mr. Hall acted aggressively toward her, pushed her and threw pepper in her eyes.

20.   Ms. Reid further alleged that Mr. Hall had put his hands around her neck a few weeks prior to the boat incident.

21.   In her complaint, Ms. Reid did not mention that she had committed any violent acts against Mr. Hall.

22.   Ms. Reid requested that Hofstra issue a no-contact order and that Mr. Hall be banned from entry into the residence hall where she resided.

***Hofstra's Response to Ms. Reid's Initial Complaint***

23.   On April 29, 2016, right after receiving Ms. Reid's complaint, Hofstra did impose a no-contact order on Mr. Hall.

24.   Under Hofstra's Policy (as defined below), a no contact order is to expire at the earlier of: a final resolution of the underlying complaint (either through a hearing or alternative resolution process); or 14 days after issuance in the event the complaining student does not take steps necessary to make a complaint and begin the disciplinary process.

25.   Mr. Hall's no contact order prohibited him from contacting Ms. Reid, and further prohibited him from entering *any* Hofstra residence hall.

26.   In connection with these prohibitions, Hofstra also distributed a "Ban Flyer" to all of its residence halls.  This Ban Flyer was to be publicly posted in each residence hall and identified Mr. Hall by name and with a photograph, and included instructions to contact Hofstra's Public Safety office in the event Mr. Hall attempted entry.

27.   Upon receiving his no contact order, Hofstra advised Mr. Hall that it issues no-contact orders at the same time to both parties involved in such disputes —Ms. Reid would be issued a no-contact order at the same time as Mr. Hall received his on or about April 29, 2016.  Yes, Ms. Reid violated the NCO soon thereafter by going to Mr. Hall's residence. It did not include any prohibition with respect to entering any residence halls (or any other campus buildings).

28.   Shortly thereafter, Hofstra's Office of Public Safety ("Public Safety") began an investigation of the allegations in Ms. Reid's complaint.

29.   The Public Safety investigation revealed that, by Ms. Reid's own admission, the incident on the boat began when Ms. Reid, finding Mr. Hall asleep on the vessel, slapped Mr. Hall in the face.

30.   The investigation further revealed that, also by her own admission, Ms. Reid then threw pepper on Mr. Hall.

31.   The investigation further revealed that, also by her own admission, Ms. Reid slapped Mr. Hall's groin area with the back of her hand.

32.   In response to Ms. Reid's physical aggressions, Mr. Hall became upset and agitated.  When Mr. Hall stood up, another male student stepped in between Ms. Reid and Mr. Hall.

33.   Mr. Hall and the other male student began getting into an altercation.

34.   A security guard on board the vessel intervened and Mr. Hall and the others soon calmed down and the incident came to an end.

35.   The process was not successful in reaching a resolution between Ms. Reid and Mr. Hall.

36.   Ms. Reid chose not to move forward toward a formal proceeding at that time as she was apparently satisfied with Hofstra's imposition of a no-contact order on Mr. Hall.

37.   Mr. Hall did not contact or attempt to contact Ms. Reid at any time after he received his no-contact order.

38.   On the other hand, on or about May 6, 2016, after demanding and receiving the imposition of a no-contact order for Mr. Hall, Ms. Reid showed up unannounced at Mr. Hall's home with a male relative to demand the immediate return of certain personal items she had left there during the time they had been dating.

39.   By happenstance, Mr. Hall was not at home when Ms. Reid showed up.  She nevertheless warned Mr. Hall's family that she would take further action if Mr. Hall failed to return her property by the following day.

40.   Ms. Reid made this unannounced visit to Mr. Hall's home after she had been directed by Public Safety not to contact Mr. Hall and after arrangements were being made for the return of her personal items through Public Safety.

***The Delayed Investigation and Hearing***

41.   On or about February 2, 2017, more than nine months after submitting her initial complaint, Ms. Reid filed a second complaint and asked Hofstra to initiate formal proceedings.  In that second complaint, Ms. Reid stated that she now wanted to initiate a formal proceeding because "did not feel safe on or off campus" and feared for her safety.

42.   A hearing was scheduled for April 12th, 2017, where Hofstra's University Administrative Conduct Board  (the "Board") was to review charges against Mr. Hall that were filed under the "Student Policy Prohibiting Discriminatory Harassment, Relationship Violence and Sexual Misconduct."  Specifically, the University charged Mr. Hall with one count of "Dating Violence" in violation of the Policy for the incident on the boat on April 28th, 2016, almost one year prior.

43.    Hofstra University's "Student Bill of Rights" states that all students have the right to "participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard" and guarantees the right to "be accompanied by an advisor of choice who may assist and advise a reporting individual, accused, or respondent…" throughout the entire administrative process.

44.    As alleged in more detail below, Mr. Hall's right to fair and impartial due process and access to an advisor of choice was violated in that Hofstra's decision was against the weight of the evidence; Mr. Hall was denied his right to confront witnesses against him; he was denied the right to have exculpatory witnesses testify on his behalf; he was denied his right to remain silent and not have that silence held against him; he was denied the right to prepare for his hearing by being denied meaningful discovery of and access to the case file; by not being allowed to have his attorney-advisor provide meaningful assistance in preparing a defense or conducting the hearing; and by being denied the ability to participate in attorney-client privileged conversations with his attorney while reviewing the case file.

45.    In preparation for the hearing, on April 7th, 2017, Mr. Hall hired counsel to represent him at the hearing.

46.    On April 11th, counsel accompanied Mr. Hall to Hofstra University to prepare for the hearing.

47.    Mr. Hall and his counsel were not allowed to make or receive copies of the statements in the case file or any other discovery materials.  Only Mr. Hall was allowed to take notes regarding the case file.  Counsel was not permitted to write anything down.

48.    Mr. Hall and his counsel were not even permitted to close the door to the preparation

room in order to engage in privileged attorney-client communications, and a staff

member refused to remove herself from the room where Mr. Hall and his counsel were

attempting to prepare his defense and/or to participate in privileged attorney-client

conversations.  The staff member refused to leave even after counsel repeatedly asked her

to do so.

49.    Mr. Hall was denied private access to the case file or a personal copy despite repeated

requests for same.  Mr. Hall was thus denied his right to prepare the defense in his

disciplinary action at Hofstra.

50.    On April 12th, 2017, the administrative hearing went forward in the Office of Community

Standards.  Present were Heather DePierro, the Assistant Dean of Students and Director

of Community Standards, who guided the proceeding; complainant Ms. Reid  with her

advisor and advocate Merry McVey-Noble; and Shaun Fein, Diane Herbert and

Roosevelt Smith who presided as the "Hearing Board."

51.    Witnesses present at the hearing were Karen O'Callaghan, Director of Hofstra Public

Safety; Robert McDonald, Associate Director of Hofstra Public Safety; and KW, Ms.

Reid's friend.  Also present were Mr. Hall and his attorney.

52.    Mr. Hall's attorney was required to sign a document whereby he agreed not to speak on

Mr. Hall's behalf, but he was permitted to be present to assist and provide advice.

53.    Mr. Hall had asked previously, in accordance with the requirements of the Policy, for the

Board to include a witness known to him as Peter "June" Thompson, a security guard on

the boat, who had previously provided a statement to Associate Director McDonald on

May 5th, 2016 via a telephone conversation that took place between Mr. McDonald and

Mr. Thompson.  Mr. Thompson witnessed the incident on the boat and was anticipated to be a favorable witness for Mr. Hall based on his statement to Mr. McDonald nearly a year earlier.

54. Despite Mr. Hall's timely request to include Mr. Thompson as a witness, Mr. McDonald conceded that he did not even attempt to reach out to Mr. Thompson and the Board did not allow him to be included on the witness list.

55. Mr. Hall was thus denied the right to defend himself through production of a witness that would exculpate him.

56. Mr. Hall had also previously asked to have the Board allow his mother to testify on his behalf.  The sum and substance of Mr. Hall's mother's testimony would have been favorable to Mr. Hall.  She would have testified as a witness with personal knowledge about Ms. Reid's allegation that Mr. Hall put his hands around her neck a few weeks prior to the boat incident.  Mr. Hall anticipated that she would have denied that such an event ever took place.

57. The Board also denied Mr. Hall's timely request to include his mother as a witness, thus further denying Mr. Hall the right to defend himself through the production of another exculpatory witness.

58. Three witnesses on the witness list, each friends of Ms. Reid and each given advance notice of the hearing, did not appear.

59. These three witnesses previously provided statements for the case file, which statements were read and considered by the Board.  Mr. Hall had no opportunity to cross-examine them.

60. Mr. Hall's right to confront his accusers was thereby violated.

61.   Only one eye-witness to the incident testified at the hearing—Ms. Reid's friend and sorority sister, "CW."  CW confirmed that she never saw Mr. Hall hit, swing at, grab or even touch Ms. Reid.

62.   During the initial investigation, in 2016, Mr. Hall had also requested that Mr. McDonald try to secure any video surveillance video that might be available from the boat.

63.   Mr. McDonald conceded that he made no attempt to secure any such video surveillance footage at any time.

64.   At the conclusion of the hearing, Hofstra found Mr. Hall "responsible" for "dating violence" in connection with April 28, 2016 incident on the vessel.  A written decision was emailed to Mr. Hall on April 13th, 2017.

65.   The finding of the Board against Mr. Hall of "dating violence" was based on false allegations by Ms. Reid, who alleged that Mr. Hall held her against a wall, did not let her leave, and threw pepper in her eyes during the boat incident.  Ms. Reid further falsely alleged that, during the spring of 2016, Mr. Hall allegedly put his hands around her neck; Mr. Hall was not found responsible for this allegation.

66.   Prior to the incident on the boat, Ms. Reid was a Resident Assistant ("RA") with free room and board and a stipend.  However, as Hofstra was fully aware, and as Ms. Reid fully admitted, she had been put on probation for a previous incident not involving Mr. Hall in which she was taken by ambulance to the hospital due to alcohol intoxication.

67.   Ms. Reid further admitted to knowing that Hofstra's "Zero-Tolerance" Policy would have been grounds for Hofstra to issue severe sanctions upon Ms. Reid if she were found to be intoxicated a second time, as she was on the vessel, up to and including the potential loss of her RA status.

10

68.     On April 28th, 2017, one year to the day after the alleged "dating violence" incident on the boat, Mr. Hall received a written outline of the sanctions imposed by the Board.  The sanctions included suspension for one semester with re-enrollment at Hofstra's discretion.

69.     In order to be considered for re-enrollment after suspension, Mr. Hall was  required to "participate in an educational or personal counseling program that would address healthy decisions regarding anger management strategies and personal relationships"; was to submit a written statement addressed to the Dean of Students which was to include:  a statement showing the progress made in the aforementioned counseling program; a summary of how Mr. Hall had addressed the issues that led to his suspension; and an action plan Mr. Hall was to implement to achieve academic and personal goals.

70.     Additionally, Mr. Hall was to submit to a personal interview with the Dean of Students before being approved to return as a Hofstra student.

71.     On May 4th, 2017, Mr. Hall appealed the decision of the Board to the Dean of Students pursuant to Hofstra's Policy.

72.     The Board issued a letter to Mr. Hall dated May 24th, 2017 denying the appeal.

73.     On May 26th, 2017, Mr. Hall again appealed to the Vice President of Student Affairs, as he was permitted to do pursuant to Hofstra's Policy.

74.     On or about June 15th, 2017, the Vice President issued a letter dated denying the appeal, adding that "this decision is final".

*The Family Court Proceeding*

75.  After Hofstra's determination finding Mr. Hall responsible for "dating violence," on or about May 12, 2017, and Ms. Reid filed petition for a protective order against Mr. Hall with the Family Court of the State of New York, County of Nassau.

76.  During those proceedings, Ms. Reid contradicted her own allegation that Mr. Hall had thrown pepper in her eyes and testified that any pepper thrown on her by Mr. Hall was not intentional.

77.  A hearing was held on or about September 21, 2017, during which the Family Court found Ms. Reid's testimony "to lack credibility"; that her answers were "evasive, non-responsive or otherwise contradictory to not only her testimony at that time but the petition she actually filed with this court."

78.  The Family Court further stated that Ms. Reid "chose a course of conduct that was inappropriate, immature or irresponsible" and "sought to shift blame of her own action onto [Mr. Hall]."

79.  The Family Court further addressed Ms. Reid directly, stating: "Ma'am, you have a problem with alcohol, and it should be addressed but I can't order you to address it."

80.  The Family Court further acknowledged that her RA position may have been jeopardized by her intoxication.

81.  The Family Court further considered testimony from the Hofstra hearing unreliable because Mr. Hall was not able to confront the witnesses against him, thereby violating Mr. Hall's rights.

82.  The Family Court denied Ms. Reid's petition for a protective order.

12

*The Article 78 Proceeding / Decision*

83.   Having exhausted his administrative remedies at Hofstra, on or about July 11, 2017, Mr.

Hall filed a petition pursuant to Article 78 of the New York Civil Practice Law and Rules

with the Supreme Court of the State of New York, County of Nassau (the "Article 78

Court").

84.   On or about April 3, 2018, the Article 78 Court issued its Decision and Order (the

"Article 78 Decision").

85.   The Article 78 Decision annulled Hofstra's findings and sanctions against Plaintiff and

further ordered that the sanctions be expunged from Mr. Hall's  student file.

86.   Among other things, the Article 78 Decision stated that the Court

"cannot in good conscience find [Hofstra's] determination was rendered in
accordance with its published procedures.  Nor does the Court find that it was
based upon [Hofstra's] exercise of honest discretion after a full review of the
operative facts.  The various deviations, taken together, renders [Hofstra's]
determination arbitrary and capricious so as to warrant judicial intervention."

87.   The Article 78 Court further found that "in several respects," Hofstra "failed to

substantially comport with its own policy."

88.   In particular, Hofstra failed to promptly adjudicate Ms. Reid's complaint as nearly one

year (over ten months) elapsed between her initial complaint and Hofstra's referral to its

Office of Community Standards.

89.   Hofstra further departed from its procedures by issuing its no-contact order that not only

prohibited contact with Ms. Reid, but banned Mr. Hall from *all* Hofstra residence halls

for nearly a full year prior to any finding of responsibility (an erroneous finding) for the

conduct alleged against him.

90.    The imposition of the no-contact order, without any durational limit or apparent expiration, constituted a departure from Hofstra's own procedures concerning such interim measures.

91.    Hofstra's nearly one-year delay in pursuing the matter prejudiced Mr. Hall, who, among other things, was no longer able to locate a key witness (Mr. Thompson) who, based on the record from the preliminary investigation in 2016, would have likely exonerated Mr. Hall.

92.    According to the Article 78 Decision, Hofstra further failed to follow its own procedures in applying its Policy in an even-handed fashion inasmuch as Hofstra imposed no discipline on Ms. Reid in spite of her own admissions that she was the initial aggressor; that she slapped him when he was asleep; that she threw pepper on him (because she knew it would anger him); that that she slapped his groin area with the back of her hand, even as not a single witness supported her claim that Mr. Hall struck her or threatened to strike her.

93.    Hofstra's Policy includes slapping as an example of dating violence.

94.    The Article 78 Court further noted that Hofstra also failed to discipline Ms. Reid for engaging in "self-help" measures by showing up at Mr. Hall's home unannounced after Hofstra had directed her not to contact Mr. Hall and had Issued Mr. Hall a no-contact order at her request.

95.    The Article 78 Court further noted that Hofstra's prohibition of Mr. Hall's counsel from a proper review of the case file interfered Mr. Hall's ability to adequately prepare a defense and that such prohibition is unsupported in Hofstra's Policy.

96.     Hofstra appealed the Article 78 Decision to the Supreme Court of New York, Appellate

        Division, Second Department and the appeal remains pending.

**V.      Causes of Action**

**COUNT I**

**20 U.S.C. § 1681 *et seq***
**TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**
**Hostile Education Environment/Discrimination/Sexual Harassment/**
**Deliberate Indifference**

97.     Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs

        of this Complaint as though fully rewritten herein.

98.     Title IX of the Education Amendments of 1972 provides, in relevant part, that:

        No person in the United States shall, on the basis of sex, be excluded from
        participation in, be denied the benefits of, or be subjected to discrimination under
        any education program or activity receiving Federal financial assistance.

99.     Defendant receives federal financial assistance for research and development.

100.    Plaintiff's gender is protected by Title IX.

101.    Defendant discriminated against Plaintiff by permitting a violation of intentional and

        substantial sexual discrimination and harassment and discrimination against him by

        creating and maintaining a sexually hostile education environment in violation of Title IX.

102.    In particular, Plaintiff was sexually harassed and assaulted by Ms. Reid, who, by her own

        admission, slapped his face, threw pepper on him and slapped his groin area.

103.    The harassment/assault was sufficiently severe and/or pervasive to undermine, detract

        from and alter the conditions of Plaintiff's education such that he was effectively denied

        equal access to Hofstra's resources and opportunities.

15

104.  Hofstra's conduct further created an abusive educational environment for Plaintiff.

105.  Upon learning of Ms. Reid's aggressions toward Mr. Hall, Hofstra had authority to address the discriminatory harassment and assault.

106.  Hofstra did nothing in response to learning of Ms. Reid's aggressions.

107.  Hofstra's representatives failed to adequately respond to or address the harassment or to act reasonably under the circumstances.  Hofstra's conduct amounted to deliberate indifference with respect to Ms. Reid's  sexual harassment and assault of Plaintiff.

108.  Instead, Hofstra worked hand in glove with Ms. Reid to promote her false claims, self-serving motive to conceal her intoxication (that would have jeopardized her RA position and stipend) and sanctioned Mr. Hall.

109.  Hofstra's conduct as set forth herein was in violation of Title IX's strictures against sexual harassment and Hofstra is liable to Plaintiff.

110.  By reason of the sexual harassment, discrimination and hostile educational environment Plaintiff has suffered and continues to suffer, Plaintiff is entitled to all legal and equitable remedies available under Title IX, including an award of punitive damages, attorneys' fees and costs.

111.  Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including extreme emotional distress, and loss of capacity for the enjoyment of life.

112.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

**COUNT II**

**20 U.S.C. § 1681** *et seq.*
**TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**
**Erroneous Outcome**

113.    Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

114.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dept. of Education); 28 C.F.R. § 54.135(b) (Dept. of Justice).  Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.

115.    As set forth above, based on the evidence gathered during its investigation and presented at Hofstra's hearing, there is more than articulable doubt as to the outcome of the proceedings.  Indeed, such doubt has already been resolved in Plaintiff's favor by the Article 78 Court.

116.    Ms. Reid was favored and Mr. Hall was adversely treated by Hofstra during its investigation inasmuch as, among other things, Ms. Reid's credibility was flawed; the fact that Ms. Reid had assaulted Mr. Hall and engaged in sexual touching without his

consent was not acknowledged by Hofstra; and that Mr. Hall was found responsible for assaulting Ms. Reid ("dating violence") against the evidence.

117.  Hofstra exhibited intentional and substantial gender bias when it failed to impose any discipline on Ms. Reid for her undisputed aggressive actions against Mr. Hall.

118.  Hofstra reached an erroneous outcome by finding Mr. Hall responsible for "dating violence" and punishing him while imposing no punishment or discipline on Ms. Reid.

119.  As a result of the Title IX action, Mr. Hall was wrongly removed from Hofstra by suspension.  Further, Mr. Hall was persona non gratis at all campus residence halls for over a year, with shaming "Ban Flyers" identifying him posted in each residence hall, causing Mr. Hall additional reputational damage.

120.  Hofstra's overall sexual misconduct complaint program impermissibly manipulated procedures to afford greater prerogatives and protections to the (female) accuser than to the (male) accused.

121.  On information and belief, Hofstra's flawed program and mishandling of Mr. Hall's case were symptomatic of a broader culture of inherent, systematic and intentional gender bias against male students accused of sexual misconduct, through which male students are unable to receive a fair and impartial student conduct process when a complaint of sexual assault is made against them by a female student.

122.  On information and belief, Hofstra sacrificed Mr. Hall's rights to the expediency of accommodating institutional pressures.

123.  Hofstra has created an environment where an accused male student is fundamentally denied due process by being prosecuted through the conduct process under a presumption of guilt—an issue Hofstra notoriously dealt with in 2009 wherein a female student falsely

18

accused four men of rape, only to recant her story, though at least in that case the female student was suspended (The story was extensively covered by the media, and the event is the subject of its own Wikipedia page, Hofstra University Rape Case, link: https://en.wikipedia.org/wiki/Hofstra_University_rape_case). Such a one-sided process deprived Mr. Hall, as a male student, of educational opportunities at Hofstra on the basis of his sex.

124.   Upon information and belief, gender bias was a motivating factor in Hofstra's handling of Mr. Hall's case and fits within a pattern of showing gender bias toward female students in cases of sexual misconduct.

125.   Hofstra's policies effectuate a failure of due process for the student population, especially the male student population, in their current state, because they encourage and facilitate the reporting of potentially false reports of sexual misconduct and/or other grievances without any consistent recourse for those who may be falsely accused, especially given Hofstra's past history.

126.   Because of the persistent pro-female and anti-male bias that permeates Hofstra's sexual misconduct procedures and practices, Hofstra's program disproportionately affects the male student population of the Hofstra community as a result of the higher incidence of female complainants of sexual misconduct against male complainants of sexual misconduct.

127.    Male respondents in sexual misconduct cases at Hofstra are discriminated against solely on the basis of sex.  They are almost invariably found guilty, regardless of the evidence, or lack thereof.

128.   Hofstra's violations of its obligations under Title IX proximately caused Mr. Hall to sustain tremendous damages, including, without limitation, emotional distress, economic injuries, reputational damages, and the loss of educational and post-graduate opportunities and other direct and consequential damages.

129.   Mr. Hall is entitled to compensatory damages for the harm he suffered as a result of Hofstra's violation of its Title IX obligations.

## COUNT III

**20 U.S.C. § 1681 *et seq.***
**TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**
**Selective Enforcement**

130.   Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

131.   Hofstra exhibited patterns of decision-making that show that the penalties Mr. Hall endured and the very decisions to initiate a Title IX investigation against Mr. Hall as well as the decision to not initiate a Title IX action against Ms. Reid motivated Hofstra's animus against Mr. Hall's gender.

132.   Defendant exhibited anti-male bias during the investigation and hearing process by the differential treatment he and the female accuser received in that, among other things, the undisputed facts showed that Ms. Reid was the aggressor and violated of Hofstra's policies.

133.   Defendant exhibited anti-male bias during the disciplinary action by the differential treatment he and Ms. Reid received in that, among other things, Ms. Reid alleged conclusory, false and unsubstantiated claims.

134.   Defendant exhibited anti-male bias during the disciplinary action by the differential treatment he and Ms. Reid received in that, among other things, Defendant could not

attribute a negative motive to Ms. Reid, but determined that by virtue of being accused, Mr. Hall could not be presumed innocent.

135.    Defendant exhibited anti-male bias during the disciplinary action by the differential treatment he and Ms. Reid received in that, among other things, Defendant did not impose any discipline on Ms. Reid even though Ms. Reid admitted assaulting Mr. Hall and admitted that she ignored Hofstra's directive not to contact Mr. Hall.

136.    Defendant further exhibited anti-male bias during the disciplinary action by the additional differential treatment he and Ms. Reid received as set forth herein.

137.    Hofstra exhibited intentional and substantial gender bias when it failed to discipline Ms. Reid for her actions against Mr. Hall which, by her own admission, included slapping his face, throwing pepper on him and slapping his groin area.

138.    Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including emotional distress, and loss of capacity for the enjoyment of life.

139.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

## COUNT IV

### Intentional Infliction of Emotional Distress

140.   Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

141.   As set forth above, Hofstra's conduct against Mr. Hall extreme and outrageous.

142.   Hofstra acted with intent to cause Mr. Hall severe emotional distress, or with disregard of the likelihood of causing him emotion distress.

143.   Hofstra's intentional conduct—it's remarkable accommodation of what clearly was a false and malicious and self-serving proffered by Ms. Reid as revealed by two State Judges—caused Mr. Hall severe emotional distress.

144.   As a direct and foreseeable consequence of the intentional infliction of emotional distress by Defendant, Mr. Hall sustained damages, including, without limitation, emotional distress, economic injuries, and other direct and consequential damages.

## COUNT V

### Breach of Contract

145.   Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

146.   Hofstra's Code of Conduct and Title IX Policy (including its Student Policy Prohibiting Discriminatory Harassment, Relationship Violence and Sexual Misconduct) represent a contractual commitment to Mr. Hall.

147.   Hofstra breached its contractual commitment by departing from its own procedures inasmuch as it failed to promptly adjudicate Ms. Reid's complaint.  Nearly one year (over

ten months) elapsed between her initial complaint and Hofstra's referral to its Office of Community Standards.

148. Hofstra further departed from its procedures by issuing its no-contact order that not only prohibited contact with Ms. Reid, but banned Mr. Hall from *all* Hofstra residence halls for nearly a full year prior to any finding of responsibility (an erroneous finding) for the conduct alleged against him.

149. The imposition of the no-contact order, without any durational limit or apparent expiration, constituted another departure from Hofstra's own procedures concerning such interim measures.

150. Hofstra's nearly one-year delay in pursuing the matter prejudiced Mr. Hall, who, among other things, was no longer able to locate a key witness (Mr. Thompson) who, based on the record from the preliminary investigation in 2016, would have likely exonerated Mr. Hall.

151. According to the Article 78 Decision, Hofstra further failed to follow its own procedures in applying its Policy in an even-handed fashion inasmuch as Hofstra imposed no discipline on Ms. Reid in spite of her own admissions that she was the initial aggressor; that she slapped him when he was asleep; that she threw pepper on him (because she knew it would anger him); that that she slapped his groin area, even as not a single witness supported any claim that Mr. Hall struck her or threatened to strike her.

152. Hofstra's Policy includes slapping as an example of dating violence.

153. The Article 78 Court further noted that Hofstra also failed to discipline Ms. Reid for engaging in "self-help" measures by showing up at Mr. Hall's home unannounced after

Hofstra had directed her not to contact Mr. Hall and had issued Mr. Hall a no-contact order at her request.

154.     The Article 78 Court further noted that Hofstra's prohibition of Mr. Hall's counsel from a proper review of the case file interfered Mr. Hall's ability to adequately prepare a defense and that such prohibition is unsupported in Hofstra's Policy.

**Prayer for Relief**

**WHEREFORE,** for the foregoing reasons, Mr. Hall demands the following relief from Defendant Hofstra University:

(i)     An award of compensatory damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional distress, economic injuries, reputational damage and other direct and consequential damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)    If warranted by the evidence, punitive damages;

(iii)   An injunction prohibiting Hofstra University from taking any further action against Mr. Hall with regard to the events described in the May 7, 2014 letters;

(iv)    An award of the costs and expenses of suit;

(v)     Attorney's fees; and

(vi)    Such other and further relief as the Court deems just, equitable and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all matters for which there is a right to a jury trial.


Dated:  New York, New York
        June 13, 2020

Respectfully Submitted,

*/s/*    Susan Kaplan
Susan Kaplan
*Attorney for Plaintiff, Mr. Hall*
30 Wall Street, 8th Floor
New Yok, New York 10005
347.683.2505
skaplan@lawkaplan.com

25